IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MANDY DELLI-VENERI, et al.,

    Plaintiffs,

v.           CIVIL ACTION NO. 2:19-cv-00689

WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION, et al.,

    Defendants.

MEMORANDUM OPINION AND ORDER

  Pending before the court are three separate motions for summary judgment filed by Defendant Britt Adkins [ECF No. 56], Defendant West Virginia Division of Corrections and Rehabilitation ("WVDCR") [ECF No. 58], and Defendant Michael Flanagan [ECF No. 60]. The Plaintiff has responded [ECF No. 62] and Defendants have replied [ECF Nos. 63, 64, 66]. The motions are now ripe for decision. Because the motions raise substantially similar arguments in favor of summary judgment, I will dispose of them together. For the reasons that follow, the WVDCR's Motion [ECF No. 58] is **GRANTED**. Defendant Adkins' Motion [ECF No. 56] and Defendant Flanagan's Motion [ECF No. 60] are each **GRANTED in part and DENIED in part.**

 I. Relevant Facts

  Plaintiff Mandy Delli-Veneri filed her Amended Complaint [ECF No. 1-1] in West Virginia state court alleging several claims against Defendants after her father,

Randy Shull, died while in the custody of the WVDCR.[1] Mr. Shull was arrested on July 26, 2017, after being charged with second-degree murder for the death of his girlfriend. He was taken to Tygart Valley Regional Jail and Correctional Facility, a state jail under the purview of the WVDCR. Mr. Shull was evaluated and processed into Tygart Valley on the afternoon of July 26, 2017. He was placed on a special watch where correctional officers were supposed to observe him every 30 minutes overnight. Plaintiff alleges the correctional officers failed to conduct the watches as assigned and that, as a result, Mr. Shull died of alcohol withdrawal. He was found unresponsive by his cellmate at 5:59 a.m. on July 27, 2017, and was pronounced deceased by emergency medical personnel—after less than 24 hours in WVDCR custody.

Plaintiff's Amended Complaint alleges violations of the Eighth and Fourteenth Amendments to the United States Constitution; violations of Article III, Sections 1, 5, and 10 of the West Virginia Constitution; and negligence. Plaintiff brings each of her claims against Britt Adkins and Michael Flanagan, the correctional officers responsible for Mr. Shull on the night he died, in both their official and individual capacities, and against the WVDCR.

### A. Mr. Shull's Intake Evaluations

When Mr. Shull arrived at Tygart Valley on the afternoon of July 26, he was examined by Casey Burner, Certified Medical Assistant ("CMA Burner"). CMA Burner was a healthcare provider employed by PrimeCare Medical of West Virginia,

---

[1] Mandi Delli-Veneri filed this lawsuit as the personal representative of her father, Randy Shull's, estate. I will refer to Ms. Delli-Veneri as "Plaintiff" and to Randy Shull as "Mr. Shull."

Inc. ("PrimeCare"). PrimeCare was contracted by the WVDCR to provide medical services to inmates. During the examination, Mr. Shull disclosed that he was an alcoholic who drank to intoxication daily. He told CMA Burner that he would suffer from alcohol withdrawal. CMA Burner recorded these disclosures. [ECF No. 60-5, at 111 ("He reports everyday use of alcohol, states he will WD.")]. CMA Burner added a note to Mr. Shull's electronic file on "07/26/2017 [at] 15:42," explaining that Mr. Shull was "placed on 30min WD watch on 7/26/17 by CMA Burner due to reporting everyday use of alcohol. Will monitor, DOJ completed and booking notified." *Id.* The record also reveals that CMA Burner added several "Alerts" to Mr. Shull's file. The first alert, entered on "7/26/2017 [at] 15:30," says "30 Minute Detox Watch." [ECF No. 60-5, at 144]. Two other alerts indicate Mr. Shull should be placed on a "Low Tier" and a "Low Bunk." *Id.* And finally, on "07/26/2017 [at] 15:31," CMA Burner added an alert for "30 minute Special Watch." *Id.*

In addition to his intake medical evaluation by CMA Burner, Mr. Shull was evaluated by Lisa Wamsley, a mental health provider employed by PrimeCare. Though Ms. Wamsley concluded that Mr. Shull was considered a "Low" suicide risk and denied suicidal ideations [ECF No. 60-5, at 100–101], she noted that he "reported he has been depressed for the past 6-7 months" [ECF No. 60-5, at 100]. As a result of the mental health evaluation, Ms. Wamsley decided to refer Mr. Shull "to Psychiatry for Medication Evaluation" and "place [him] on a 30 minute special watch due to [the] nature of his crime." [ECF No. 60-5 at 101]. Importantly, however, Ms. Wamsley did not enter her report in the electronic chart until July 27, 2017, between 8:00-8:30 a.m.

3

[ECF No. 60-5, at 99 ("LATE ENTRY. Pt's information was not in computer at the time this worker left.")].

Mr. Shull was found dead at 5:59 a.m. on July 27, 2017—*over two hours before* Ms. Wamsley made her official report.

To be clear, there is evidence that Ms. Wamsley must have informed at least CMA Burner that she intended to place Mr. Shull on a special watch due to the nature of his crime on July 26, 2017. In CMA Burner's notes, added to Mr. Shull's file on July 26, CMA Burner included that "Patient was placed on 30min Special Watch by Lisa Wamsley, Mental Health due to his nature of crime [sic]." [ECF No. 50-6, at 111]. It appears that only medical staff had access to these notes. *Id.* It is unclear who at Tygart Valley had access to the Alerts in Mr. Shull's file, but the document [ECF No. 60-5, at 144] does not show the same access restriction notations as the medical and mental health notes.

### B. The Special Watch

As a result of his intake evaluations, Debra Minnix, the administrator at Tygart Valley, ordered that Mr. Shull be placed on a 30 minute special watch overnight on July 26, 2017. Administrator Minnix testified at her deposition that she does not remember exactly why she gave the watch order, but she was likely contacted by either Ms. Wamsley or the booking department. [ECF No. 60-6, at 5]. As explained above, Ms. Wamsley intended to place Mr. Shull on the watch due to the nature of his crime, and CMA Burner notified booking that Mr. Shull was to be placed

4

on the "30min WD watch." [ECF No. 60-5, at 111]. Therefore, it is unclear whether Administrator Minnix gave the watch order for one or both of those reasons.

Regardless, Mr. Shull was placed in a double-bunk cell overnight and the correctional officers on duty, Defendants Adkins and Flanagan, were instructed to complete a special watch of Mr. Shull every 30 minutes.[2] They were given "watch papers," otherwise known as an "Offender Watch Log," where they were to record the time and any observations at each check. Defendants Adkins and Flanagan argue that they were never informed of a specific reason for the watch, but they were only told that it was a 30 minute special watch. The Offender Watch Log is not especially helpful on this question. The Log does not specify how often checks are to be performed for a "special watch." But all parties agree that Mr. Shull was placed on a 30 minute watch schedule.

Plaintiff alleges, as supported by the record, that Defendants Adkins and Flanagan failed to conduct the checks as ordered and falsified the log to cover their failures. Though Defendants Adkins and Flanagan dispute the allegation that they failed to complete the checks as required, their argument on that point is disingenuous. The internal Report of Investigation [ECF Nos. 60-2, 60-3, 60-4, 60-5] completed by D.E. Bittinger, Deputy Chief of Operations of the WVDCR, includes a detailed discussion of what Mr. Bittinger observed on the video footage from the night of Mr. Shull's death. [ECF No. 50-2, at 3–6]. The Report explains that between the

---

[2] By all accounts, what a "special watch" entails is not well defined. However, at a minimum, a correctional officer completing a special watch is supposed to observe the inmate for any unusual signs or symptoms. If the inmate is sleeping during the night, the correctional officer need not wake the inmate every 30 minutes, but he should still observe the inmate for any signs of distress.

5

hours of midnight and 6:00 a.m. on July 27, 2017, Defendants Adkins and Flanagan entered Mr. Shull's section a combined total of four times. However, these "checks" included only "glanc[ing] in the cell during razor pass"; "t[ying] off a garbage bag to the door" but never looking in Mr. Shull's cell; "go[ing] through the motions but barely glanc[ing] into cells"; and "handing out clothing requests but a complete security check was not accomplished." [ECF No. 50-2, at 5]. The Report concludes that "Correctional Officer II Britt Adkins falsified logs during this incident" [ECF No. 60-2, at 9] and "Correctional Officer I Michael Flanagan falsified logs during this incident." [ECF No. 60-2, at 10].

Though it is clear that Defendants Adkins and Flanagan failed to complete the checks thoroughly and on time as ordered, the record does not indicate that Mr. Shull was exhibiting any obvious symptoms that would have raised suspicion. According to the medical staff notes, on July 26 at 20:13, Ashley Sitton, LPN, reported that "Pt remains on 30 minute special watch. No c/o were voiced. No abnormal behaviors noted or reported. Will continue to monitor." [ECF No. 60-5, at 111]. Then, at 03:01 a.m. on July 27, Bruce Price, RN, noted that "Pt. remains on 30 minute watch no unusual behavior reported no c/o voiced continue watch." *Id.* It is unclear, however, whether Ms. Sitton and Mr. Price actually observed Mr. Shull in his cell at those times. I note that the description of the video footage in Mr. Bittinger's Report of Investigation does not include any discussion of medical personnel observing Mr. Shull overnight. Indeed, the Report of Investigation notes that "[a]t 0301 hours, Officer Flanagan enters the section for a security check. He appears to go through the motions but

6

barely glances into cells." [ECF No. 60-2, at 5]. Even still, there is nothing in the record to indicate the Mr. Shull ever suffered any easily observable symptom of alcohol withdrawal. These symptoms may include nausea and vomiting; tremors; seizures; visual, auditory, and/or tactile hallucinations; delirium; and agitation. [ECF No. 56-3, at 3–4].

### C. Mr. Shull's Death

At 5:59 a.m. on July 27, 2017, Mr. Shull's cellmate, Charles Lewis, used the dayroom intercom box to radio the tower and inform the correctional officers that Mr. Shull was unresponsive in the cell. Correctional Officers and medical staff responded but Mr. Shull was declared dead a short while later. An autopsy was performed by Dr. James Kaplan, Deputy Chief Medical Examiner, from the West Virginia Department of Health and Human Services Office of the Chief Medical Examiner. The autopsy report notes that Mr. Shull had a "history of chronic alcohol abuse," and that he died a "sudden death" on his first day of incarceration "as the result of acute alcohol withdrawal." [ECF No. 60-2, at 20].

Defendants have retained experts who opine that Mr. Shull's cause of death was not alcohol withdrawal. David Stuart, M.D., concluded that "[m]ultiple etiologies are possible for [Mr. Shull's] demise, but I do not believe that alcohol withdrawal was the inciting cause of his death based on the fact that he did not exhibit any of the classical signs and symptoms, progressing from mild to the more serious moderate and severe stages." [ECF No. 56-3, at 3]. Likewise, Francisco Diaz, M.D., disagreed with the Medical Examiner's cause of death determination after he reviewed the

autopsy report and examined "tissue organs under the microscope." [ECF No. 56-4, at 3]. Dr. Diaz explained that Mr. Shull's heart "far exceeds the average weight of the heart for an adult male of similar age" and that there was evidence of fibrosis and scarring on the heart. *Id.* Dr. Diaz concluded, "[t]hose two findings of the heart, in tandem or in isolation, are known to induce irregular rhythms of the heart and sudden death [and] are enough reason to account for Mr. Shull's demise." *Id.* "In summary, Mr. Shull's heart was enlarged and with evidence of prior episodes of lack of oxygen and that coupled with pulmonary emphysema. That constellation of cardio-pulmonary findings is enough to induce sudden death and this observer would have certified his death as such." *Id.*

## II. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. A court "may grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick*

8

*v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986). Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256.

Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

### III. Discussion

Based on these facts, Plaintiff brings claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution; alleges violations of Article III, Sections 1, 5, and 10 of the West Virginia Constitution; and alleges negligence on the part of all Defendants, including

both Defendants Adkins and Flanagan in their individual and official capacities. Certain claims are easily resolved so I will dispose of those issues first.

### A. 42 U.S.C. § 1983 – Official Capacity and the WVDCR

Claims for constitutional violations pursuant to 42 U.S.C. § 1983 may only proceed against "persons." "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 60 (1989). WVDCR is a state agency and Defendants Adkins and Flanagan are agents of the State while acting in their official capacities. In her Response [ECF No. 62], Plaintiff agrees that her § 1983 claims against the WVDCR and Defendants Adkins and Flanagan in their official capacities are not actionable. Therefore, the Motions for Summary Judgment as to these claims are **GRANTED**.

### B. 42 U.S.C. § 1983 – Eighth Amendment

It is settled law that the Eighth Amendment prohibition on cruel and unusual punishment only pertains to punishments that occur after an individual has been convicted. *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that the Eighth Amendment does not apply until after a "formal adjudication of guilt"); *U.S. v. Hall*, 551 F.3d 257, 273 n.19 (4th Cir. 2009). It is undisputed here that Mr. Shull was only a pre-trial detainee. Therefore, the Eighth Amendment does not apply in this case and Defendants' Motions for Summary Judgment on this claim are **GRANTED**.

### C. West Virginia Negligence

Plaintiff alleges that all Defendants were "negligent in the performance of their duties within the scope of their employment and such negligence was the proximate cause" of Mr. Shull's death. [ECF No. 1-1, at 16]. Plaintiff further alleges the WVDCR negligently supervised Defendants Adkins and Flanagan, and adopted a custom, policy, and practice of encouraging correctional officers to falsify records and complete inadequate inmate checks. Defendants argue they are entitled to qualified or official immunity. The Supreme Court of Appeals of West Virginia has held,

> the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.,* and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Syl. Pt. 6, *Clark v. Dunn*, 465 S.E.2d 374 (W. Va. 1995).

Plaintiff does not contest that the WVDCR is a state agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, or that Defendants Adkins and Flanagan were performing discretionary functions, as defined by West Virginia law. Therefore, Defendants are entitled to immunity from suit and the Motions for Summary Judgment on this claim are **GRANTED.**

### D. West Virginia Constitutional Claims

Plaintiff brings claims for violations of three sections of the West Virginia Constitution.

First, Plaintiff alleges Defendants violated Article III, Section 1. That section, the "Bill of Rights," provides "the basic principle" upon which the state's democratic structure is founded. *Allen v. State Human Rights Comm'n*, 324 S.E.2d 99, 109 (W. Va. 1984). Article III, Section 1, does not independently give rise to a cause of action. *See Schoonover v. Clay Cnty. Sheriff's Dep't*, No. 2:19-cv-00386, 2020 U.S. Dist. LEXIS 90484 at *21–22 (S.D. W. Va. May 21, 2020). Defendants' Motions for Summary Judgment on this claim are **GRANTED**.

Next, Plaintiff alleges Defendants violated Article III, Section 5. That section is the West Virginia counterpart to the Eighth Amendment to the United States Constitution. Syl. Pt. 8, *State v. Vance*, 262 S.E.2d 423, 425 (W. Va. 1980). Again, because Mr. Shull was a pretrial detainee, Article III, Section 5 is inapplicable and Defendants' Motions for Summary Judgment on this claim are **GRANTED**.

Finally, Plaintiff alleges Defendants violated Article III, Section 10, West Virginia's counterpart to the Fourteenth Amendment to the United States Constitution. The parties argue there is some debate as to whether West Virginia recognizes a private right of action for a violation of this section. "[T]his court has previously found that Article III provisions of the West Virginia Constitution do not provide a private cause of action for damages, *with the exception of § 10.*" *Nutter v. Mellinger*, No. 2:19-cv-00787, 2020 WL 401790 at *6 (S.D. W. Va. Jan. 23, 2020) (emphasis added). The Supreme Court of Appeals of West Virginia has held "a private cause of action exists where a municipality or local government unit causes injury by denying that person rights that are protected by the Due Process Clause embodied

within Article 3, § 10." Syl. Pt. 2, *Hutchison v. City of Huntington*, 479 S.E.2d 649 (W. Va. 1996). Just recently, the state Supreme Court reaffirmed this holding. *Fields v. Mellinger*, 851 S.E.2d 789, 793 n.2 (W. Va. 2020) ("[W]e do not, by our decision today, disturb the *Hutchison* holding."). Because Plaintiff's claim does exist as a matter of law, I consider it next along with Plaintiff's Fourteenth Amendment § 1983 claim.

### E.  42 U.S.C. § 1983 – Fourteenth Amendment and Article III, § 10

Plaintiff next alleges that Defendants Adkins and Flanagan violated Mr. Shull's rights under the Fourteenth Amendment to the Constitution by failing to complete the 30 minute special watch as ordered. Defendants Adkins and Flanagan assert they are entitled to qualified immunity.

#### 1.  Relevant Law

##### a.  Qualified Immunity

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Both the Supreme Court of the United States and the United States Court of Appeals for the Fourth Circuit have noted that "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In ruling on an issue of qualified immunity, a court must consider a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id.* If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case. *Id.* "When determining whether a right was 'clearly established,' '[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established.'" *Mack v. Turner*, No. 5:15-03589, 2016 WL 7840216, at *6 (S.D. W. Va. Dec. 13, 2016) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Wilson v. Layne*, 526 U.S. 603, 620–21 (1999) (Stevens, J., dissenting). There does not need to be a "case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The salient question . . . is whether the state of the law . . . gave [Defendants] fair warning that their alleged conduct was unconstitutional." *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

14

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Thus, courts consider whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition." *Adams*, 884 F.3d at 227 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

Here, Plaintiff alleges Defendants Adkins and Flanagan violated Mr. Shull's Fourteenth Amendment due process rights through deliberate indifference to a serious medical need.

### b. Deliberate Indifference

Though deliberate indifference is typically considered an Eighth Amendment claim, where the claimant "was a pretrial detainee and not a convicted prisoner at the time of the alleged denial, this claim is governed by the due process clause of the fourteenth amendment rather than the eighth amendment[]." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (citing *City of Revere*, 463 U.S. at 244)). "The due process rights of a pretrial detainee are at least as great as the eighth amendment protections . . . while the convicted prisoner is entitled to protection only against punishment that is cruel and unusual, the pretrial detainee . . . may not be subjected to *any* form of punishment." *Id.* (internal quotation marks omitted). The Fourth Circuit has held that "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs' within the meaning of" Eighth Amendment jurisprudence. *Id.* (citation omitted).

"In order to state a cognizable claim for denial of medical care . . . an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on such a claim, a plaintiff must offer "proof that the medical need in question is objectively 'serious,' and that the defendant acted with subjective indifference, meaning he or she 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Adams v. Ferguson*, 884 F.3d 219, 227 (4th Cir. 2018) (alterations in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Further, the subjective mental state required of a deliberately indifferent actor is "more than mere negligence." *Farmer*, 511 U.S. at 835. It is instead "somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citing *Farmer*, 511 U.S. at 835). This means that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. "Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference to those needs." *Miltier v.*

16

*Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds*, *Farmer*, 511 U.S. at 837). However, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### 2. Analysis

The first question I must address is whether, taking the facts in the light most favorable to her, Plaintiff has alleged a violation of the clearly established constitutional right to be free from deliberate indifference.[3] As explained above, deliberate indifference has both an objective and a subjective prong.

First, Plaintiff must show, objectively, that Mr. Shull had a serious medical need. In this case, I have little trouble concluding that Mr. Shull did have such a medical need. When Mr. Shull had his intake evaluation with CMA Burner, he plainly said that he would experience alcohol withdrawal while incarcerated. Knowing that withdrawal comes with severe medical symptoms, CMA Burner ordered that Mr. Shull be observed every 30 minutes. It seems obvious that the reason for this order was to prevent the serious harm that can result from alcohol withdrawal. I recognize the parties' arguments on this matter focus on whether Mr. Shull had symptoms that were so obvious even a lay person would recognize the need for medical attention. However, I find that the relevant question is whether Mr. Shull

---

[3] Defendants Adkins and Flanagan do not dispute that the right to be free from deliberate indifference to a serious medical need is clearly established in this case. Further discussion on that point is unnecessary.

17

had a condition "diagnosed by a physician as mandating treatment." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Though Mr. Shull was not evaluated by a physician, he was examined by a healthcare provider contracted by the WVDCR to provide inmate care. That provider, CMA Burner, recognized the risk that Mr. Shull would suffer alcohol withdrawal and ordered, as an initial treatment, that he be observed every 30 minutes to prevent further threats to his health. While CMA Burner was not a "physician," the title is a distinction without a difference in this instance. CMA Burner was a qualified medical provider who was entrusted to evaluate Mr. Shull to determine his medical needs, if any, upon booking at Tygart Valley. Surely prison officials must be held accountable to carry out any orders resulting from that evaluation and should not be permitted to escape liability by engaging a provider other than a physician.

When CMA Burner recognized the substantial risk that Mr. Shull would suffer from alcohol withdrawal, she diagnosed that risk and ordered the watch. That a watch is not a traditional "treatment" is immaterial. A provider can diagnose a condition that poses a substantial health risk and order the appropriate treatment without being forced to wait for more severe symptoms requiring medication. I find that Mr. Shull did have an objectively serious medical need.

The next question is whether Defendants Adkins and Flanagan were deliberately indifferent to that medical need. Of course, deliberate indifference requires that Defendants were subjectively aware of the risk to Mr. Shull. As I have explained, it is unclear whether Administrator Minnix ordered the watch as a

withdrawal watch or due to the nature of Mr. Shull's offense. It is likewise unclear whether Defendants Adkins and Flanagan knew of the reason for the watch or saw the "30 Minute Detox Watch" alert in Mr. Shull's file. [ECF No. 60-5, at 144]. Because the Defendant's subjective knowledge is a disputed question of fact, qualified immunity is not appropriate.

The Defendants are not entitled to qualified immunity at this stage, and the Motions for Summary Judgment on this claim are **DENIED**.[4]

## IV. Conclusion

For the foregoing reasons, the WVDCR's Motion [ECF No. 58] is **GRANTED**. Defendant Adkins' Motion [ECF No. 56] and Defendant Flanagan's Motion [ECF No. 60] are each **GRANTED in part and DENIED in part**. The only remaining claims are Plaintiff's 42 U.S.C. § 1983 claim for violations of the Fourteenth Amendment and the related state constitutional claim under Article III, § 10, both against Defendants Adkins and Flanagan in their individual capacities. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: March 30, 2021

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

[4] Defendant Flanagan also argues that summary judgment is appropriate on the Fourteenth Amendment claim because Plaintiff fails to show that any deliberate indifference caused Mr. Shull's death. This argument falls flat. There is a genuine dispute of fact as to whether Defendants Adkins and Flanagan had actual knowledge of Mr. Shull's medical needs. If the jury concludes that they did have knowledge but disregarded the risk to Mr. Shull, the jury could likewise conclude that the deliberate indifference proximately caused Mr. Shull's death by denying him adequate medical care.